**In the Matter of TRANSATLANTIC AND PACIFIC CORP., Bankrupt.**

United States District Court
S. D. New York.
April 22, 1963.

Act, §§ 47, sub. a(1, 10), 49, 11 U.S.C.A. §§ 75, sub. a(1, 10), 77.

———◆———

Krause, Hirsch, Gross & Heilpern, New York City, for bankrupt.

Bergerman & Hourwich, New York City, for trustee.

EDELSTEIN, District Judge.

This petition for review of an order of the Referee in Bankruptcy presents the question whether the Trustee in Bankruptcy may contract, with a party who is not a creditor of the bankrupt, to sell the right of access to the bankrupt's books, records and files in consideration for a promise to pay to the Bankrupt's estate a percentage of any sum that the non-creditor may recover as plaintiff in a law suit pending in West Germany. The agreement dated August 17, 1961, between Edward Schilling, the Bankrupt's trustee and Notgemeinschaft Deutscher Kohlen Bergbau G.m.b.H. (hereinafter referred to as "Ruhr-Kohle",) a corporation organized under the laws of the Federal Republic of Germany, provides that the agreement "shall not be valid or enforceable until it shall have been submitted to the United States District Court for the Southern District of New York, sitting in bankruptcy, * * and the entry of an order of the said Court approving this agreement."[1] In accordance with this provision the Trustee, on September 13, 1961, applied to the Referee for approval of the agreement. The Bankrupt then filed a cross petition for an order: (a) denying the Trustee's application for an order approving the Ruhr-Kohle agreement; (b) directing that the books and records of the Bankrupt estate be withheld from

Ruhr-Kohle; (c) enjoining the Trustee and his counsel from implementing the proposed agreement or disclosing the results of their investigations or the records and papers of the Bankrupt estate; (d) and for further relief not pertinent to the instant motion. Hearings were held before the Referee on the petition of the Trustee and the Bankrupt-Debtor's[2] cross petition. Representatives of creditors appeared and voiced their opinions concerning the agreement. On February 19, 1962, the Referee filed his findings of fact and conclusions of law denying the Trustee's petition for approval of the agreement and granting the Bankrupt's cross petition. The Referee's order was based on the following conclusions of law:

(a) The Trustee has no legal right to disclose or to afford access to anyone other than a party in interest in this proceeding of the books and records of Tapco, the Bankrupt Debtor, or to permit copies of such books and records by anyone other than a party in interest in this proceeding;

(b) Ruhr-Kohle is not a party in interest in this proceeding;

(c) There is no grant of authority under the Bankruptcy Act that empowers the Trustee of Tapco to sell information that comes into his possession under the circumstances of the case at bar.

■■ The Trustee, as a party aggrieved by the order of the Referee, then brought this petition for review of the order. 11 U.S.C. § 67, sub. c, as amended 11 U.S.C.A. § 67, sub. c (Supp. 1962).[3] The Referee's Findings of Fact

---

1. Trustee-Ruhr-Kohle Agreement, dated August 17, 1961, par. 6.

2. A Plan of Arrangement was filed pursuant to Chapter XI, § 321 of the Act in this previously commenced and pending bankruptcy proceeding. The Chapter XI proceeding is going forward concurrently with the administration of the bankrupt estate.

3. 11 U.S.C.A. § 67, sub. c provides:
"A person aggrieved by an order of a referee may, within ten days after the entry thereof or within such extended time as the court upon petition filed within such ten-day period may for cause shown allow, file with the referee a petition for

are not contested and the dispute involves only his legal conclusions. The "clearly erroneous" rule which applies to Findings of Fact does not obtain here. In re Hot Springs Broadcasting, Inc., 210 F.Supp. 533 (W.D.Ark.1962); In re Novelty Belts Manufacturing Co., 173 F.Supp. 461 (S.D.N.Y.1959). It should be noted that the presumption of correctness which applies to a Referee's findings of fact do not pertain to his conclusions of law. In the Matter of Tauber on Broadway, Inc., 271 F.2d 766, 79 A.L.R.2d 752 (7th Cir.1959); Walker v. Commercial National Bank of Little Rock, 217 F.2d 677 (8th Cir. 1954); In re Hot Springs Broadcasting, Inc., supra; In re Novelty Belts Manufacturing Co., supra.

The agreement between the Trustee and Ruhr-Kohle relates to a suit that Ruhr-Kohle brought against Hugo Stinnes Industrie und Handel, a German corporation (hereinafter referred to as "Hustinhand") in the courts of West Germany. Hustinhand, as well as the Bankrupt (hereinafter referred to as "Tapco") were under the control of Hugo and Dieter Stinnes, both German nationals. Tapco's business is the exporting of coal to foreign purchasers. One of Tapco's European customers was Hustinhand. In 1958 Tapco and Hustinhand entered into eleven individual supply contracts whereunder Tapco agreed to deliver coal and to charter vessels in order that Hustinhand be supplied with various amounts of American-mined coal. At this point in time, Ruhr-Kohle appeared on the scene. Ruhr-Kohle is a cartel of German coal producers formed for the purpose of improving the competitive position of German produced coal vis-a-vis American produced coal. Ruhr-Kohle's plan for obtaining a better market for German-produced coal included a program of inducing German industrial consumers to cancel their American coal supply contracts in consideration for a cancellation payment from Ruhr-Kohle. Pursuant to this scheme, Ruhr-Kohle contacted Hustinhand and induced Hustinhand to cancel the supply contracts that Hustinhand had outstanding with Tapco. Hustinhand received a substantial payment for effecting the cancellations.

Subsequently, Ruhr-Kohle became suspicious that it had been duped. Ruhr-Kohle acquired information which indicated that the Tapco-Hustinhand contracts were not valid contracts at all but were merely "convenience" arrangements having no binding effect on either party. Ruhr-Kohle contended that it had made substantial payments to obtain the cancellation of valid coal supply contracts when, in fact, those contracts had been invalid and illusory. Ruhr-Kohle then instituted an action against Hustinhand in the Federal Republic of Germany for the recovery of 3,526,172.83 Deutsche Marks (DM) (approximately $880,000), together with interest thereon, which the contract alleges represents "an overpayment" of funds to Hustinhand for the cancellation of the Tapco agreements. Ruhr-Kohle claimed, in addition, that it had additional claims against Hustinhand which would aggregate a total of 10,879,926.16 Deutsche Marks.

Now as to Tapco, prior to the bankruptcy proceeding Tapco was caused to assign without consideration, the eleven Hustinhand coal contracts to another Stinnes company, Oceanica of Canada Limited, a Canadian corporation. These coal contracts were assigned to Oceanica while Dieter Stinnes was serving as President of Tapco. Although the true state

review of such order by a judge and serve a copy of such petition upon the adverse parties who were represented at the hearing. Such petition shall set forth the order complained of and the alleged errors in respect thereto. Unless the person aggrieved shall petition for review of such order within such ten-day period, or any extension thereof, the order of the referee shall become final. Upon application of any party in interest, the execution or enforcement of the order complained of may be suspended by the court upon such terms as will protect the rights of all parties in interest."

of facts relating to these so-called "convenience contracts" has not yet been ascertained, Tapco's officers, in testimony before the Trustee, sought to justify this transfer to Oceanica by contending that the contracts were illusory. The Trustee alleges that Tapco's officers produced documents to support this contention. Trustee claims that these facts indicated a potential cause of action by Tapco's estate against the transferee and the Stinnes interests.

In March 1961 the attorney for Ruhr-Kohle proposed to the Trustee that if Ruhr-Kohle was afforded access to the books and records of Tapco and the books and records and work product of the Trustee relating to Tapco's transactions with Hustinhand, Tapco's estate would be compensated for its services by a percentage of any recovery by way of suit or settlement that Ruhr-Kohle would recover from Hustinhand. Negotiations were conducted between the Trustee, the Trustee's counsel and the attorney for Ruhr-Kohle as to the details of an agreement and, in particular, the percentage of any recovery which the estate would receive. These negotiations culminated in the agreement which, if approved, would effect the following:

(a) Ruhr-Kohle would pay to the Trustee, after the recovery of all or any part of its claims against Hustinhand, by judgment, settlement or otherwise, five per cent (5%) of the first DM 3,526,172.83 and forty-five per cent (45%) of any amount or amounts in excess thereof, viz., 5% in respect of DM 3,526,172.83 and 45% of the balance between said amount and DM 10,879,926.16, insofar as actually collected by Ruhr-Kohle.

(b) The Trustee would make a full disclosure to Ruhr-Kohle of the books, records and files of the bankrupt and the Trustee's own records and work-product relating to Hustinhand and would make available to Ruhr-Kohle copies of any items which might be requested by Ruhr-

Kohle; the cost thereof to be paid by Ruhr-Kohle.

(c) The Trustee's counsel would, on request, make available to the attorney for Ruhr-Kohle the results of counsel's investigations and studies of the law and the facts on the matters involved.

(d) The estate of the bankrupt would not be liable nor responsible for the payment of costs, disbursements, legal fees, or expenses incurred in the prosecution of the aforementioned claims against Hustinhand and said expenses would be paid by Ruhr-Kohle.

(e) The agreement would not be an assignment by the Trustee to Ruhr-Kohle of any claims or rights of the estate against Hustinhand or any other person, firm or corporation.

The Bankrupt contends that the Referee's conclusions are sound in that the Trustee-Ruhr-Kohle Agreement is not sanctioned by the Bankruptcy Act. Section 70, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. a enumerates the specific categories of the Bankrupt's property to which the Trustee takes title as of the date of the filing of the petition. The Bankrupt asserts that § 70, sub. a contains an exclusive list of the categories of property that pass to the Trustee and points out that nowhere in § 70, sub. a is there any grant of authority to the Trustee to sell [his] work-product. * * *" Consequently, the Trustee, the Bankrupt maintains, has no right to grant access to the Bankrupt's books and records to a party having no direct interest in the estate.

Moreover, the Bankrupt submits that its contention that the agreement should not be approved finds ample support in § 47 and in § 49 of the Bankruptcy Act which provide, *inter alia*, that information concerning the Bankrupt, as well as inspection of the Bankrupt's books and records is expressly limited to "all parties in interest." See 11 U.S.C.A. § 75; 11 U.S.C.A. § 77. The Bankrupt claims that Ruhr-Kohle is not a party in interest

in this proceeding and that therefore a sale to Ruhr-Kohle of the right to examine its books and papers would be violative of the Act.

The Bankrupt also maintains that affirmance of the order invalidating the contract is compelled by the policy and purpose of the Bankruptcy Act. The Bankrupt urges that if the Ruhr-Kohle agreement is validated the court would "convert the Trustee from a fiduciary, duty-bound expeditiously to administer and liquidate the bankrupt's property, into a travelling salesman, purveying information acquired in his trust capacity * * * to persons having no direct interest in the subject matter of the estate for their use in proceedings entirely unrelated to the bankrupt estate."

Furthermore, Tapco points out that the Trustee-Ruhr-Kohle Agreement is not in the best interests of its bankrupt estate. Tapco indicates that its creditors objected to the Agreement on the ground that the revelation of information from Tapco's files would severely prejudice the prosecution of certain claims that the Trustee allegedly seeks to bring against Hustinhand. Moreover, Tapco asserts that the consummation of the Trustee-Ruhr-Kohle Agreement would seriously impair its ability to effectuate a Plan of Arrangement and would limit its capability to carry on its business after reorganization. Tapco states that Hustinhand is one of Tapco's more important customers and is one of the companies which Tapco expects to help finance its rehabilitation. Tapco fears that its participation, even indirectly, in the Ruhr-Kohle litigation will permanently alienate Hustinhand and thus cause it irreparable injury in its attempts to achieve viability.

Furthermore, Tapco submits that the Trustee's recommendation for approval of the Agreement places the Trustee in "a two-fold conflict of interest" with the best interests of the Bankrupt estate. On the one hand, the information which the Trustee would be obliged to provide to Ruhr-Kohle would allegedly support Ruhr-Kohle's position that certain contracts between Hustinhand and Tapco were invalid. On the other hand, the Trustee, Tapco alleges, has taken the position that the Bankrupt estate has certain causes of action against Hustinhand which are based upon the validity of the contract. Tapco contends that the Trustee cannot maintain both positions at the same time since his disclosure of said information to Ruhr-Kohle is directly in conflict with the interest of the bankrupt estate's cause of action against Hustinhand. Should Ruhr-Kohle prevail in its litigation against Hustinhand the Bankrupt expresses serious apprehensions that the Trustee's avowed claims against Hustinhand will be lost to Ruhr-Kohle in a race of diligence.

The Trustee, as may be expected, hardly takes the doleful and lugubrious attitude toward the agreement as is voiced by Tapco. The Trustee argues that § 70, sub. a and 47, sub. a of the Bankruptcy Act establish that the books and records of the bankrupt constitute property to which he takes title and which are thus subject to disposition in the same manner as other types of property owned by the Trustee. The Trustee also asserts that the Referee's concern over the possibility of abuses flowing from the recognition of the Trustee's power to investigate for "strangers to the estate" is an exaggerated and groundless apprehension. In fact, the Trustee contends that the proposed agreement, rather than damage the estate, would materially benefit the estate in two respects: (a) it would elicit evidence in the German litigation which would be of aid in ascertaining the existence of any cause of action in favor of the estate against Hustinhand; (b) it could result in a recovery of $872,000 to the estate.

The question of the authority of a bankruptcy trustee to sell access to the bankrupt's books and records, as well as his work-product,—although it presents an issue for resolution which is of significance to the proper administration of the Act—is apparently a novel one as

counsel have not cited, and the court's research has failed to disclose, a single case in which the precise question has been adjudicated, or let alone, raised. Neither Wellington v. Kelly, 84 N.Y. 543 (1881) nor any of the other cases cited by the Trustee have any direct or indirect bearing on this problem. But while the questions presented are ones of first impression, certain provisions of the Bankruptcy Act, as well as a reference to its broad purpose, may provide the court with the principles to illumine this penumbral area of the law.

■■ First, it is evident that there is merit to the Trustee's contention that the books and records of the Bankrupt constitute property to which he takes title. Section 70, sub. a of the Act, 11 U.S.C.A. § 110, sub. a provides that the Trustee takes title to "documents" relating to the property of the Bankrupt. Section 1(16) of the Act, the Definitions section, states that documents "shall include any book, deed, record, paper, or instrument in writing." And it has been held that "[t]hese books and papers of the bankrupt, which come within the designation of documents, are regarded by the bankrupt act as personal property, the title to which, by operation of law, is vested in the trustee." In re Hess, 134 F. 109 (E.D.Pa.1905); Dier v. Banton 262 U.S. 147, 43 S.Ct. 533, 67 L.Ed. 915 (1923); Matter of Harris, 221 U.S. 274, 279, 31 S.Ct. 557, 55 L.Ed. 732 (1910); Babbitt v. Dutcher, 216 U.S. 102, 30 S.Ct. 372, 54 L.Ed. 402 (1909). But the fact that ample authority supports the Trustee's claim that the Bankrupt's books and records are property to which he takes title, does not end the matter. The fact that the Trustee has legal title to the Bankrupt's books and records does not lead inexorably to the result that a contract to sell the right of access thereto is authorized by the Bankruptcy Act. A contract to sell the Bankrupt's property, although it may qualify, under contract principles, as a binding agreement, must still comport with the philosophy and purpose of the Act, as well as the Act's specific provisions, in order that it may be approved. This sound principle, that the Trustee's sale of the Bankrupt's property must be examined to determine whether it is consistent with the purpose of the Bankruptcy Act, was recently reaffirmed in In re Airlines Transport Carriers, 129 F.Supp. 679 (S.D.Cal. 1955). In Airlines Transport the subjects of the Trustee's sale were a Letter of Registration and a Carrier Operating Certificate issued by the Civil Aeronautics Board, and objection to the sale was made on the ground that it violated the Civil Aeronautics Act. The court held that the question of validity was not to be decided with reference to the Civil Aeronautics Act but that the controlling consideration was whether the sale was compatible with the purpose of the Bankruptcy Act—to preserve the assets for an equitable distribution to creditors. In re Airlines Transport Carriers, supra, 129 F.Supp. at 683. See Citrigno v. Williams, 255 F.2d 675 (9th Cir. 1958); Landy v. Silverman, 189 F.2d 80 (1st Cir. 1951); Cf. In re Hines, 69 F.2d 52 (2d Cir. 1934).

A harmonious reading of specific provisions of the Act indicates that the Act does not give sanction to the proposed Trustee-Ruhr-Kohle Agreement. Section 47, sub. a(1), 47, sub. a(10), and § 49, when read together, reveal that Ruhr-Kohle's entanglement in the Bankrupt's affairs is not authorized. 11 U.S.C.A. § 75; 11 U.S.C.A. § 77. Section 47, sub. a provides:

"Trustees shall (1) collect and reduce to money the property of the estates for which they are trustees, under the direction of the court, and close up the estates as expeditiously as is compatible with the best interests of the parties in interest; (10) furnish such information concerning the estates of which they are trustees and their administration as may be requested by parties in interest."

Section 49 provides that "[t]he accounts and papers of receivers and trus-

tees shall be open to the inspection of officers and all parties in interest."

■ Although the section of the Act which enumerates the definitions does not amplify upon the term "parties in interest," judicial construction of the term is helpful in determining whether or not Ruhr-Kohle fits within that definition. It has been held that "[i]t is manifestly too narrow a construction of the phrase 'parties in interest' to restrict it merely to unsecured creditors in bankruptcy. The bankrupt is * * * a party in interest. A creditor holding security * * * is also a party in interest. And it probably may be stated with accuracy that all persons whose pecuniary interests are directly affected by proceedings in bankruptcy are * * * parties in interest." In re United Button Co., 137 F. 668, 672 (D.Del.1904). In re Devonian Mineral Spring Co., 272 F. 527 (E.D.Ohio 1920). But see In re Woodmar Realty Co., 241 F.2d 768, 64 A.L.R.2d 883 (7th Cir. 1957). 2 Collier, Bankruptcy 1315 (Moore ed. 1962). Under these judicial constructions of the term, it would appear that a tortuous and wholly unsupportable construction of the term "parties in interest" would be required to accord Ruhr-Kohle party in interest status. It is abundantly clear that Ruhr-Kohle is neither a secured nor an unsecured creditor. And it is no less patent that Ruhr-Kohle is not directly affected by the administration of the bankrupt's estate. Ruhr-Kohle's dispute is with Hustinhand and Ruhr-Kohle's sole interest in Tapco is, at best, merely incidental to its primary interest—the successful prosecution of its suit against Hustinhand. Although, on the one hand, there is direct authority permitting creditors of the bankrupt to examine its books and records, Georgia Jewelers, Inc. v. Bulova Watch Co., 302 F.2d 362, 363 (5th Cir. 1962), there is, on the other hand, a lack of any authority to support the view that a stranger to the proceedings may be accorded the right to obtain information from the Bankrupt's books and records for a price.

Nor do the provisions of the Bankruptcy Act afford any basis for lending support to a proposition of such dubious propriety. It would be anomalous indeed to hold that books and records of the Bankrupt could not be *disclosed* to one who is not a party in interest and at the same time permit the right of access to the books and records to be *sold* to the same party. Congress could not have intended such an anomalous interpretation of the Act.

■ Moreover, the Trustee and his counsel conceded in the hearings before the Referee that Ruhr-Kohle was not a party in interest to the estate. Nevertheless, they now maintain that § 70, sub. a(3) of the Act, 11 U.S.C.A. § 110 provides authority for the agreement in that it vests the Trustee with the same powers that the Bankrupt "might have exercised for his own benefit." Since the Bankrupt had the power to make the agreement, the argument runs, so, simply stated, does the Trustee. But the major premise of this plain syllogistic contention is unsupportable. Whatever may have been the rights of the Bankrupt as to its own books and records before the date of bankruptcy, the Trustee in bankruptcy does not enjoy the same autonomy. The Trustee's activities are specifically circumscribed by the Bankruptcy Act. His actions must be compatible with the bankrupt's best interests as well as the interests of the bankrupt's creditors. 2 Collier, Bankruptcy 1737 (Moore ed. 1962). The contention that the Trustee possesses the same unlimited powers over the bankrupt's books as did the bankrupt before the bankruptcy is wholly without merit.

■ Furthermore, and perhaps more significantly, the proposed agreement to sell information obtained from the Bankrupt's books and records is contrary to the purpose and philosophy of the Bankruptcy Act. The Bankruptcy Act was enacted for the dual purpose of (1) discharging the indebtedness of the honest debtor so that he will be afforded an un-

burdened opportunity to start afresh in his economic pursuits, and (2) providing a speedy and efficient means of distributing his assets equitably among creditors. 1 Collier, Bankruptcy 22 (Moore ed. 1962); 3 Sutherland Statutory Construction 377–8 (Horack ed. 1943); Pepper v. Litton, 308 U.S. 295, 304–305, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); Straton v. New, 283 U.S. 318, 51 S.Ct. 465, 75 L.Ed. 1060 (1930); Williams v. United States Fidelity and Guaranty Co., 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915). The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate among creditors holding just demands. Kuehner v. Irving Trust Co., 299 U.S. 445, 451–452, 57 S.Ct. 298, 81 L.Ed. 340 (1937); Small Business Administration v. McClellan, 272 F.2d 143 (10th Cir. 1959), and "[c]onsistent speed in the administration of bankrupt estates is a desideratum; and conservation by economical administration is a paramount consideration." In re State Thread Co., 126 F.2d 296 (6th Cir. 1942). A but meagre catalogue of some of the ramifications that could flow from the approval of this agreement should suffice to demonstrate that it should not be sanctioned. Approval of the agreement would necessarily involve the Trustee in a long-range project in a foreign jurisdiction. In the event of the successful conclusion of the Ruhr-Kohle suit the Trustee would then be committed to collect—hopefully without litigation—the claim and distribute it to creditors. Thus, if all of the bankrupt's property has been liquidated and stands ready for an equitable distribution to creditors, the distribution could not be effected until Ruhr-Kohle had paid its percentage of the recovery pursuant to the agreement. The holding of the Bankrupt's affairs in a state of suspended animation most assuredly would not comport with the policy of an Act which contemplates the expeditious disposition of the bankrupt's property to creditors.

Another and equally compelling reason for not countenancing this agreement or, for that matter, any agreement which invites the divulgement of the debtor's affairs to a stranger to the proceeding is contained in Referee Loewenthal's opinion:

"Through the use of this Court's process and the sweeping power of investigation, there are undoubtedly many instances where information and material is developed that has no bearing on the estate administered—but which strangers to the estate (not "parties in interest") would find to their decided advantage in pending or prospective litigation and for which they might be willing to pay handsomely. The borderline between fortuitous and conscious or deliberate development of such material may become difficult or well nigh impossible to ascertain. The approval by the Court of the contract under consideration herein would set a dangerous precedent and one that could lead to results much to be deplored."

The Act very definitely circumscribes the duties of a Trustee in the administration of the assets in his charge. A Trustee's activities are necessarily limited by the very nature of his office which imposes upon him the obligation to accomplish the objectives of the Act only by prescribed means. And wisely so, for to permit a Trustee to utilize his stewardship of the Bankrupt's estate in behalf of a non-interested party would be to sanction conduct that is not only fraught with great danger of abuse, but is wholly alien to the philosophy and purpose of the Bankruptcy Act as well.

It is interesting to note that the Trustee's counsel in the original negotiations with Ruhr-Kohle, admitted that the authorization for the agreement was not firmly rooted in principle or precedent. On examination before the Referee, the

Trustee's counsel admitted that he had rendered the opinion that the records, information, and books of the Bankrupt should not be disclosed to Ruhr-Kohle.[4]

However, the Trustee, by his counsel, urges that the agreement should be approved because disclosure of the books and records to Ruhr-Kohle will result ultimately in a benefit for the estate and creditors. More specifically, he urges that the proposed agreement would benefit the estate in that it: (1) will elicit evidence in the German litigation which would be of aid in ascertaining the existence of any cause of action in favor of the estate against Hustinhand; (2) it will result in payment to the estate from any recovery obtained by Ruhr-Kohle, which may amount to a total of $872,000 computed as follows: 5% on the first $880,000 and 45% of the next $1,-840,000 of recovery.

It is beyond doubt that such an argument has an obvious allure and appeal. Nothing more than an optimistic and rosy view is needed to argue that anything that may potentially benefit the Bankrupt's estate by securing it a substantial asset is beneficial and should be approved. But this line of reasoning, to the effect that benefit is a factor builds upon an obvious non sequitur. Since the disclosure of the books and records of the Bankrupt to a non-party in interest is not sanctioned by the provisions of the Bankruptcy Act, the consideration of benefit to the Bankrupt's estate is not relevant.

The Bankrupt's other contentions set out more fully, supra, that approval of the agreement might hamper its rehabilitation, and further, that the agreement would require disclosure of information which the Trustee might later need to prosecute successfully his claim against Hustinhand, need not be answered here. Since the court holds that neither the provisions nor the philosophy and purpose of the Bankruptcy Act authorize such an agreement, the question of possible detriments or benefits that might flow from its approval become moot.

The order of the Referee denying the Trustee's petition for approval of the agreement with Ruhr-Kohle and granting in part the Bankrupt's petition disapproving the agreement is hereby affirmed. So ordered. Settle order on two weeks' notice.

---

4. Transcript of Testimony before Referee, October 17, 1961, p. 41.